IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

UNITED STATES OF AMERICA

v.   CRIMINAL NO.: WDQ-12-0570

DANIEL TAYLOR

* * * * * * * * * * * * *

MEMORANDUM OPINION

Daniel Taylor is charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Pending is his motion to suppress evidence. On August 15, 2013, the Court held a hearing at which Baltimore City Police Detective Exdol Williams and Taylor testified. For the following reasons, the motion was denied.

I. Background[1]

Williams testified that on May 30, 2012 at about 10:30 p.m., he was in the passenger seat of an unmarked police car driven by Detective Clemmie Anderson; the car was heading west on East Biddle Street in Baltimore, Maryland. Williams knew this as a high crime area--with significant drug activity and violence--that had been selected by the Police Department for special attention.

---

[1] The facts are from the Court's recollection of the hearing testimony and exhibits.

While driving, the detectives saw a tan Cadillac turn right onto East Biddle from North Port Street. The Cadillac was "creeping" (i.e., moving very slowly), at about 5-10 miles per hour, "as if looking for someone."[2] As the Detectives passed within a few feet of the Cadillac, Williams could not see inside the car and believed the windows were excessively--and illegally--tinted under Maryland law.[3]

Anderson turned his car to follow the Cadillac and stop it for the tinting violation. The Cadillac turned right onto Milton Avenue, continuing very slowly. Anderson followed the Cadillac. After crossing Chase Street, Anderson activated his lights and stopped the Cadillac.

Anderson approached the driver's side of the car; Williams went to the passenger's side. Because of the tinted windows, Williams could not see how many people were inside the car. Anderson asked the driver, Joseph Harrington, to roll down all the windows so the detectives could see inside the car. Anderson then asked Harrington for his license and registration, which he admitted he did not have. After Anderson directed

---

[2] A car driving this slowly is indicative of an impending driveby shooting, but Williams did not testify that he expected a shooting.

[3] Maryland law does not permit a vehicle's windows to exceed 35% tinting. Md. Code Ann., Transp. 22-406(i)(1)(i).

Harrington to leave the car, Williams instructed Taylor to face south down Milton Avenue. Taylor complied.

Williams asked Taylor if he "minded if [Williams] checked him." Taylor said "no" (i.e., he did not mind) and raised his hands in consent to the search.

Williams began to "pat down" Taylor, starting at his shoulders. As Williams passed Taylor's shoulders, Taylor turned around. Williams directed Taylor to again face Milton Avenue and continued searching him. When Williams reached Taylor's stomach, Taylor turned around and reached for his waistband. Williams pushed Taylor against the police car, and put him in a "bear hug" with Williams's hands on top of Taylor's. Williams felt what he thought was a gun in Taylor's waistband. Backup arrived and helped Williams restrain Taylor. Williams recovered the gun and placed it on top of the Cadillac. Williams estimated that the time from the initial stop to the recovery of the gun was five to six minutes. Williams does not receive any incentive from the Police Department for recovering firearms.

Williams also testified about police procedure during stops for improper window tinting. Baltimore City Police do not carry light meters to test the tinting levels. Instead, they issue repair orders, which the driver takes to an inspection station or State Trooper barracks. There, the tinting is tested and a sticker is issued if the tinting is legal.

Taylor testified that Williams never asked for his consent to the search. Instead, Williams asked him to get out of the car and face the street. Taylor asked "Why? because [he] had not done anything wrong." In response, Williams grabbed him around the waist.

The government's exhibits clearly showed that the car's windows were tinted and significantly more difficult to see through than other cars, even in daylight.

II. Analysis

Taylor sought suppression of the gun, asserting that the stop of the Cadillac and Williams's search of his person were unconstitutional. ECF No. 18. The government asserts that the stop and search were lawful. ECF No. 23.

The Court credited Williams's testimony. He receives no reward or incentive for seizing guns.[4] *Hr'g*. In contrast, Taylor had a significant stake in the outcome of his testimony.

A. The Stop

Any stop of a vehicle by the police is a "seizure" for purposes of the Fourth Amendment. *See United States v. Branch*,

---

[4] Further bolstering the believability of Williams's testimony is the observation that it was contrary to one of the government's arguments. He testified that until Taylor spun around the second time--during the search--he did not suspect that Taylor was armed. *Hr'g*. This is contrary to the government's opposition that stated that the search was justified because Williams had reasonable suspicion from the beginning that Taylor was armed and dangerous. *See* ECF No. 23 at 9-10.

4

537 F.3d 328, 335 (4th Cir. 2008); see also Brendlin v. California, 551 U.S. 249, 257 (holding that a traffic stop seizes passengers). "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." Id. For a traffic violation to support a stop, the officer must have probable cause to believe the violation occurred.[5] See Whren v. United States, 517 U.S. 806, 810 (1996). "Any detention longer than reasonably necessary to accomplish the purposes of the stop must be justified by at least a reasonable suspicion of other criminal activity." United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012).

Under Maryland law, driving a vehicle "equipped in any manner in violation" of Md. Code Ann., Transp. Title 22 is a misdemeanor. Md. Code Ann., Transp. §§ 22-101(a)(iii), 27-101(a). Passenger cars may not have "any tinting materials added to the window after manufacture of the vehicles that do not allow a light transmittance through the window of at least

---

[5] In contrast, the officer need have only reasonable suspicion of unlawful conduct to stop the vehicle. See United States v. Ohangbon, 434 F. App'x 299, 300-01 (4th Cir. 2011) (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)).

35%."[6] *Id.* § 22-406(i)(1)(i). If a police officer observes a vehicle "being operated in violation of [this provision], the officer may stop the driver of the vehicle and, in addition to a citation charging the driver with the offense, issue to the driver a safety equipment repair order." *Id.* § 22-406(i)(2).

Williams and Anderson could not see into the Cadillac because of the significant window tinting, even when they passed within a few feet of the other car. *Hr'g*. Although it was dark, the Detectives' belief that the tinting was unlawful was reasonable; this is confirmed by the continued difficulty of seeing into the vehicle during the day, as shown by photographs of the vehicle. *See, e.g.*, Gov't Ex. 3F. As "[p]robable cause is a flexible standard that simply requires 'a reasonable ground for belief of guilt' and 'more than bare suspicion,'"[7] the officers had probable cause to believe that the tinting violated Maryland law. Accordingly, there was sufficient justification for the traffic stop. *See United States v. Davis*, 460 F. App'x 226, 230 (4th Cir. 2011).

Further, the length of the stop was permissible. Officers are entitled to request license and registration, run a computer

---

[6] Maryland regulations also include several procedural requirements about color and labeling of post-manufacture tinting. *See State v. Williams*, 934 A.2d 38, 43 (Md. 2007).

[7] *Ortiz*, 669 F.3d at 444 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

check, and issue a ticket. *See United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011). Anderson immediately asked the driver for his license, which Harrington indicated was suspended. *Hr'g*. Harrington and Taylor were then asked to leave the car. *Id.* "Officers may, of course, ask drivers to step out of their vehicles during a traffic stop." *Davis*, 460 F. App'x at 231. As the encounter--from the beginning of the stop until the seizure of the gun--lasted no more than six minutes and the consensual search of Taylor, *see infra*, occurred immediately after he was asked to leave the car, the scope and duration of the stop were not unreasonably extended. *Ortiz*, 669 F.3d at 444. Accordingly, the stop was constitutional.

B. The Search

There is no dispute that Williams did not have a warrant to search Taylor. However, consent to a search is an exception to the Fourth Amendment's warrant requirement, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973), and is valid if it is "(1) knowing and voluntary and (2) given by one with authority to consent." *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007).

Clearly, Taylor had authority to consent to a search of his person. Taylor's response to Williams's question if he "minded if [Williams] checked him" was "No." *Hr'g*. This response was an affirmative indication of consent: i.e., that Taylor *did not*

7

*mind* if a search was conducted. Taylor's raising his hands and initial cooperation during the search confirm this conclusion. Similarly, there is no indication that the consent was coerced: Williams was not yelling, had not drawn his gun, and made no threats. *Hr'g*. Accordingly, the consent was knowing and voluntary.[8]

III. Conclusion

As the stop and the search were constitutional, Taylor's motion to suppress was denied.

_____  _____
  8/16/13                  William D. Quarles, Jr.
Date                       United States District Judge

---

[8] Taylor has not asserted that his "spinning around" was an attempt to revoke consent. Even after his first spin, Taylor continued to cooperate, indicating continuing consent. The second spin was a serious challenge to the search. However, because the second spin--as Williams's patdown reached Taylor's waistband--led Williams to believe that Taylor had a gun and may have been preparing to use it, Williams believed that Taylor was attempting to evade the search to avoid discovery of the gun. *Hr'g*. Accordingly, he reasonably believed that Taylor was armed and dangerous. *Id*. Accordingly, if Taylor's second spin to face Williams was a revocation of his consent, by then Williams had reasonable suspicion to continue the patdown. *See United States v. Powell*, 666 F.3d 180, 185-86 (4th Cir. 2011).