IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

DANIEL TAYLOR,

*Defendant*.

Criminal No.:  ELH-12-0570

**MEMORANDUM OPINION**

Daniel Taylor, defendant, entered a plea of guilty on August 19, 2013 (ECF 39) to the charge of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).  *See* ECF 1. The plea was tendered pursuant to a Plea Agreement.  ECF 40.  In the Plea Agreement, the parties agreed that defendant qualified as an Armed Career Criminal.  *Id.* ¶ 6(b).  And, in accordance with Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to a sentence of 180 months' imprisonment, *id.* ¶ 9, which corresponded to the mandatory minimum sentence.  *Id.* ¶ 3.

Sentencing was held on February 26, 2014.  ECF 57.  Judge William D. Quarles, Jr., to whom the case was then assigned, sentenced the defendant to 180 months of imprisonment, with credit from May 30, 2012.  ECF 58.[1]

Pursuant to 18 U.S.C. § 3582(c)(1)(A), Taylor has moved for compassionate release on the ground that he suffers from several serious health conditions.  ECF 94.  He also included an exhibit. ECF 94-1.  In addition, he has filed supplemental correspondence.  ECF 98, ECF 109.

The government opposes the Motion.  ECF 107.  It has also submitted defendant's medical

---

[1] The case was reassigned to me on September 30, 2019, due to the retirement of Judge Quarles.  *See* Docket.

records.  ECF 107-1.  In the government's view, defendant's medical conditions do not warrant his release.  Moreover, the government asserts that "the nature of the offense in the instant case and Mr. Taylor's criminal history all militate against his motion."  *Id.* at 1.  Taylor has filed a "Sur-Reply."  ECF 112.  I shall consider ECF 94, ECF 98, ECF 109, and ECF 112 collectively as the "Motion."

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall grant the motion in part, and reduce Taylor's sentence to 165 months of incarceration, which equates to almost 92% of his original sentence.

## I.      Background

On May 30, 2012, Baltimore City police officers stopped a car in which defendant was a passenger.  ECF 40, ¶ 6(a).  Officers directed Taylor to exit the car, conducted a pat-down, and recovered a loaded firearm from his waistband.  *Id.*  Taylor was subsequently charged with possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g).  ECF 1.

As mentioned, Taylor entered a plea of guilty on August 19, 2013, pursuant to a Plea Agreement.  ECF 39, ECF 40.  Under the terms of the Plea Agreement, the parties agreed that Taylor qualified as an Armed Career Criminal, pursuant to 18 U.S.C. § 924(e).  ECF 40, ¶ 6(b).  And, pursuant to Fed. R. Crim. P. 11(c)(1)(C) ("C Plea"), they agreed to a sentence of 180 months imprisonment, which corresponds to the congressionally mandated minimum sentence.  *Id.* ¶¶ 3, 9.

Moreover, the parties stipulated that defendant had a base offense level of 33 under 18 U.S.C. § 924(e) and § 4B1.4 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").  *Id.* ¶ 6(b).  The government agreed to two deductions for acceptance of responsibility, resulting in a final offense level of 31.  *Id.* ¶ 6(c).  The parties also agreed that

defendant had a criminal history category of VI. *Id.* ¶ 7.

The Presentence Report ("PSR," ECF 46), indicated that defendant was born in 1968 and was 45 years of age at the time of sentencing. *Id.* at 1. He had sixteen criminal history points, which established a criminal history category of VI. *Id.* ¶ 57. Alternatively, the PSR determined that Taylor qualified as an Armed Career Criminal under 18 U.S.C. § 924(e). ECF 46, ¶ 57. Therefore, he had a criminal history category of VI under U.S.S.G. § 4B1.1. *Id.* ¶¶ 57-59.

The PSR set forth defendant's previous convictions. *Id.* ¶¶ 26-54. They included felony drug offenses (*id.* ¶¶ 36-38, 45-50), handgun violations (*id.* ¶¶ 29-31, 39-44), reckless endangerment (*id.* ¶¶ 34-35), and first degree assault. *Id.* ¶¶ 51-54. As to the first degree assault conviction, the PSR explains, in part, *id.* ¶ 54:[2]

> Investigation revealed the victim and defendant were involved in a verbal confrontation which escalated into a domestic altercation. The defendant brandished a steak knife and cut the victim's throat, stabbed her in the chest and left side of the neck. The defendant fled the area on foot in a[n] unknown direction. The victim was transported to Johns Hopkins by ambulance and was treated for her sustained injuries. The victim was listed in a guarded/stable condition.

The PSR did not specify the predicate offenses for the Armed Career Criminal determination. However, at sentencing on February 26, 2014, defense counsel did not challenge the determination. ECF 67 (Sentencing Transcript) at 3. And, the government noted that the parties agreed to the criminal determination. *Id.*

Judge Quarles reviewed defendant's prior convictions. *Id.* at 7-8. Nevertheless, he did not specify the predicates for his finding that defendant qualified as an Armed Career Criminal. *Id.* at 8.

---

[2] In that case, the defendant was also charged with attempted second degree murder. ECF 46, 51.

The Guidelines called for a sentence ranging from 188 to 235 months of imprisonment. ECF 40 ¶ 78.  As noted, the Court imposed a term of 180 months of imprisonment, consistent with the terms of the C Plea.  ECF 57, ECF 58.

Taylor noted an appeal to the Fourth Circuit concerning the denial of his motion to suppress.  ECF 60.  The Fourth Circuit affirmed the judgment on March 2, 2015.  ECF 70.  The mandate issued on March 24, 2015.  ECF 71.  Defendant's request for a writ of certiorari to the Supreme Court was denied on October 5, 2015.  *See Taylor v. United States*, 577 U.S. 819, 889 (2015).

Taylor subsequently moved to vacate his conviction pursuant to 28 U.S.C. § 2255.  ECF 72.  I denied the motion on October 7, 2022.  ECF 99, ECF 100.  While defendant's motion to vacate was pending, he filed the pending Motion under 18 U.S.C. § 3582(c)(1)(A).

Taylor is currently incarcerated at USP Hazelton.  *Bureau of Prisons Inmate Locator*, https://www.bop.gov/inmateloc/# (search by BOP Register Number "56128-037") (last accessed December 13, 2023).  He has served approximately eleven years and six months (138 months), or 77% of his sentence, exclusive of good time credit.  According to the government and the Inmate Locator, defendant has a projected release date of April 7, 2025.  *Id.*; ECF 107 at 2.[3]

**I.      Standard of Review**

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022);

---

[3] Defendant states that his projected release date is March 11, 2025.  ECF 94 at 2.

*United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute." *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

Section 3582 of Title 18 of the United States Code was first enacted as part of the Sentencing Reform Act of 1984.  As originally enacted, it permitted a court to alter a sentence only upon motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See Bethea*, 54 F.4th at 831; *see*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, compassionate release was an infrequent occurrence, because the BOP rarely filed such a motion on an inmate's behalf.  *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).  However, as a result of the enactment of the First Step Act ("FSA") in December 2018, a federal inmate could file a motion for compassionate release directly with the court, so long as the inmate first exhausted administrative remedies.  *See* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)); *see also United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020).

With the passage of the 2018 FSA, Congress "broadened" the authority of courts to grant sentencing modifications. *Malone*, 57 F.4th at 173. Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes courts to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule that a federal sentence is final. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021). The FSA resulted in a sea change in the law.

In particular, the 2018 FSA authorized a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis added). That is, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release. *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.

Nonetheless, there are restrictions. Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met. *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831. In other words, the analysis consists of "two steps." *Bond*, 56 F.4th at 383.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief." *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021). If that criterion is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing

factors, to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169. However, as the Fourth Circuit has recognized, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement"). Critically, as discussed below, amendments to the Policy Statement took effect on November 1, 2023. Prior to the amendments, however, the Policy Statement began: "Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2021). Interpreting this language in *McCoy*, 981 F.3d at 282, the Fourth Circuit stated that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." Therefore, on the basis of that earlier text, the Court held: "When a defendant exercises his . . . right to move for compassionate release on his own behalf, § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts." *McCoy*, 781 F.3d at 281. As a result, district courts were "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

As indicated, the Fourth Circuit based its holding in *McCoy* and other cases on a version

of the Policy Statement that has since been amended.  *See* Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28254 (May 3, 2023) (providing notice of amendments to Congress).  In particular, as a result of the amendments that took effect on November 1, 2023, the Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2023) (emphasis added).  Thus, the Sentencing Commission has made the Policy Statement expressly applicable to defendant-filed motions under § 3582(c)(1)(A).  *Cf. McCoy*, 981 F.3d at 282.

Therefore, it appears that the Fourth Circuit's conclusion in *McCoy*, 981 F.3d at 281, to the effect that "§ 1B1.13 is not an 'applicable' policy statement," is no longer consistent with the Guidelines, as amended.  This is because the Policy Statement is now expressly applicable to defendant-filed motions pursuant to 18 U.S.C. § 3582(c)(1)(A).

By statute, a court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions. 18 U.S.C. § 3582(c)(1)(A).  The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

> (B) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
>> (1) (A) extraordinary and compelling reasons warrant the reduction; or
>>
>> (B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
>>
>> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

The Policy Statement identifies six circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence. *Id.* § 1B1.13(b)(1)– (6). These are: certain medical circumstances of the defendant, such as terminal illness or the inability to receive specialized medical care while incarcerated, *id.* § 1B1.13(b)(1); the defendant's age, *id.* § 1B1.13(b)(2); the defendant's family circumstances, *id.* § 1B1.13(b)(3); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction of, a correctional officer, *id.* § 1B1.13(b)(4); the defendant received an "unusually long sentence," *id.* § 1B1.13(b)(6); and "any other circumstances or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." *Id.* § 1B1.13(b)(5).

Prior to the amendments, the district court was obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389, 2396 (2022); *Troy*, 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *United States v. Brice*, 2022 WL 3715086, at *2 (4th Cir. Aug. 29, 2022) (per curiam). Where appropriate, the district court had to "account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *United States v. Mangarella*, 57 F.4th 197, 203 (4th Cir. 2023); *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n.3. However, such developments did not warrant a recalculation of the Guidelines. *Troy*, 64 F.4th at 184.

Notably, § 1B1.13(c) of the Policy Statement now specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be

considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement."  However, "if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction."  *Id.*

Section 1B1.13(d) of the Policy Statement, which limits the weight a court may assign to a defendant's rehabilitation while serving a sentence, is also relevant.  It provides that, "[p]ursuant to 28 U.S.C. §994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  *Id.*  "However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted."  *Id.*

Even if a defendant establishes that extraordinary and compelling reasons warrant relief, the court must also consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826–27 (2010); *Brown*, 78 F.4th at 128; *Mangarella*, 57 F.4th at 200, 203; *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329–30 (noting

that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d at 693–94 (district court must give due consideration to the § 3553(a) factors). Notably, the recent amendments to the Guidelines did not alter this requirement.

The "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with . . . training, medical care, or other correctional treatment.'" *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)). As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 at 500). And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain. *Bond*, 56 F.4th at 384–85.

"A district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Meza v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the

11

§ 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018).  And, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion.  *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).  For example, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'"  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In providing such an explanation, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.  In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

### III.  COVID-19

#### A.

Health officials confirmed the first case of COVID-19 in the United States on January 31, 2020.[4] *United States v. Pair*, 84 F. 4th 577, 580 (4th Cir. 2023) (citation omitted).  Then, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5]  Two days later, on March 13, 2020,

---

[4] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease*

President Trump declared a national emergency concerning the COVID-19 pandemic. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)*, TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P. That declaration was extended on several occasions. *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

The pandemic spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam). Indeed, for a significant period, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, 462 F. Supp. 3d 746, 752–53 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). Schools and businesses were closed, or operated on a limited basis, in an effort to thwart the spread of the virus, which is extremely contagious. *Pair*, 84 F.4th at 589; *see Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://perma.cc/QGL2-3URS. As the Fourth Circuit has put it, in the early months of 2020, "a new reality set in. Nations around the world announced stringent limitations on in-person interaction . . . businesses ground to a halt; and death tolls mounted." *Pair*, 84 F.4th at 580.

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.* Nevertheless, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United*

---

*and the Virus that Causes It*, WORLD HEALTH ORG., https://perma.cc/24J3-UQZN.

*States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020), *abrogation on other grounds recognized by United States v. Phillibert*, 557 F. Supp. 3d 456 (S.D.N.Y. 2021) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

People infected with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus caused severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden Marks One Million U.S. COVID Deaths After Losing Political Battles*, REUTERS (May 12, 2022), https://perma.cc/TLA5-YNFB.   And, as of March 10, 2023—the last day on which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://perma.cc/J7XS-FYHT.

The Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and has repeatedly revised its guidance concerning medical conditions that pose a greater risk of severe illness due to COVID-19.  The CDC most recently updated its guidance in May 2023 to reflect the most current data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 11, 2023), https://perma.cc/923J-T5P8.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma

(moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities such as Down syndrome; heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; having a BMI 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See COVID-19 Risks and Information for Older Adults*, Ctrs. For Disease Control & Prevention (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

**B.**

As noted, the coronavirus is "highly contagious." *Pair*, 84 F.4th at 589. At the outset of the pandemic, some of the "measures we now know to be useful in combating the spread of the virus (such as masking, separation . . . and vaccinations) were either nascent or, as in the case of vaccines, unavailable." *Id.* Nevertheless, in an effort to prevent the spread of COVID-19, the CDC urged, *inter alia*, the practice of "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, Centers For Disease Control & Prevention (Jan. 26, 2023), https://perma.cc/UJ98-2V6S; *see also Pair*, 84 F.4th at 585.

However, social distancing and "rigorous personal hygiene," which are "important combatants to the virus," are particularly difficult in the penal setting. *Seth*, 461 F. Supp. 3d at

248.  Indeed, prisoners have little ability to protect themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020), https://perma.cc/3RHL-WNKU.  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We Do Not Feel Safe,'* WASH. POST (Aug. 24, 2020), https://perma.cc/K6SW-LFGX (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to limit their spread.  *See Coreas v. Bounds*, TDC-20-0780, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021), https://perma.cc/TR7Q-8H9J ("The cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.  Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins

faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519–20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, "in recognition of [the] stark reality" that COVID-19 posed substantial challenges to incarcerated individuals, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 461 F. Supp. 3d at 248. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."

Thereafter, on March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to

grant home confinement to any inmate . . . ." *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP should prioritize for review for home confinement eligibility those inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

## C.

There is no cure for the coronavirus.  But, medical therapies have continued to improve, and vaccines are now generally available.  *See Stay Up to Date with COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL & PREVENTION (Oct. 4, 2023), https://perma.cc/VZ77-KN7W.  Although the vaccines do not appear to prevent illness, they do seem to reduce the seriousness of an illness.

On January 4, 2021, at about the time the first vaccines became available, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://perma.cc/P4KL-PEZW.  It provided that administration of the COVID-19 vaccines (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://perma.cc/2FF2-G6PX.

Much has changed since the coronavirus first emerged in early 2020.  And, the virus, too, has changed repeatedly, with multiple strains and variants.  As of May 11, 2023—the last day on

which the CDC updated its vaccine tracker—approximately 69% of the total U.S. population had completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up.  *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/B2KG-M4E3 (final update May 11, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/6W5Q-55DR (final update May 11, 2023).

### D.

In an interview in September 2022 on the CBS television show "60 Minutes", President Biden declared that the pandemic was "over" in the United States.  Alexander Tin, *Biden Says Covid-19 Pandemic is "Over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id*.  And, on April 10, 2023, President Biden signed into law House Joint Resolution 7, "which terminate[d] the national emergency related to the COVID-19 pandemic."  Pub. L. No. 118-3, 137 Stat. 6 (2023).

Nevertheless, at the time of this writing, data suggests that COVID-19 remains prevalent.  *See COVID Data Tracker*, CNTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last updated Dec. 11, 2023).  Moreover, available data may not provide a full picture of COVID-19's spread, because "[s]ince the end of the public health emergency on May 11, 2023, data that has been crucial to understanding the spread and impact of Covid is reported by government sources less frequently, or is no longer reported at all."  *Track Covid-19 in the U.S.*, THE NEW YORK TIMES,

https://www.nytimes.com/interactive/2023/us/covid-cases.html (last updated Dec. 13, 2023).

## I. Discussion

### A.

As noted, a defendant may move for compassionate release, but only after he or she has exhausted administrative remedies or thirty days have elapsed since a request was made to the warden. *See* 18 U.S.C. § 3582(c)(1)(A).

Taylor asserts, under oath, that he submitted a request for compassionate release to the Warden of his institution on April 6, 2022, and that his request was denied. ECF 94 at 3, 12; ECF 94-1 at 1. Additionally, Taylor asserts in his "Sur-Reply" that "while this case was pending Mr. Taylor filed a second Compassionate Release request with the Warden Lovett at U.S.P. Hazelton . . . ." ECF 112 at 15. However, according to the government, the BOP can find no evidence of the defendant's request. ECF 107 at 3.

As mentioned, Taylor asserted, under oath, that he asked the Warden for compassionate release. Moreover, Taylor's exhibit (ECF 94-1) reflects that Taylor submitted a request for compassionate release to the Warden on April 6, 2022. *Id.* at 1; *see also id.* at 1–3. Neither Taylor's assertion, under oath, nor his exhibit, is refuted by the government with actual evidence, such as an Affidavit from the Warden. Therefore, I am satisfied that Taylor has satisfied his administrative remedies.

### B.

In his Motion (ECF 94), Taylor asserts that he has submitted his Motion "due to the precarious health circumstance that has inundated [his] life since 2018." *Id.* at 5. He explains, *id.*:

> I have deterioration in my internal body that warrant [sic] release. For the past 6 months I have been experiencing large amounts of blood being left in my stool. I am also dealing with a PSA total of 3.6 NG/ML meaning value >0.2 ng/ml which is evidence of biochemical recurrence of cancer. I am 54 and african american also

have [ ]acute ulcerative colitis with thickened des[c]ending/sigmoid colon, external hemorrhoids, severe left sided colitis.  I have low white blood cell count, type 2 diabetes, high blood pressure, bad liver, high cholesterol, bad vision, I am also the sole provider for my home.

In its Opposition (ECF 107), the government concedes that Taylor "suffers from several chronic conditions." *Id.* at 3.  But, the government asserts that Taylor's medical conditions do not constitute an "extraordinary and compelling" reason for release because he "does not point to the risk posed by COVID-19 as a reason for his early release." *Id.*  According to the government, "there is no indication, and Mr. Taylor does not allege, that he is terminally ill nor that his condition is acute." *Id.*  And, the government contends that "the medical records indicate that Mr. Taylor is currently receiving treatment for several of these conditions" and that he "has not alleged, and there is no evidence to suggest, that the BOP is failing to provide needed care or that his care is in some way inadequate." *Id.*

As noted, effective November 1, 2023, § 1B1.13(b)(1) of the Policy Statement identifies four circumstances under which a defendant's medical condition may provide an extraordinary and compelling reason for relief.  *See* U.S.S.G. § 1B1.13(b)(1)(A)–(D).  First, under § 1B1.13(b)(1)(A), "a terminal illness (*i.e.,* a serious and advanced illness with an end-of-life trajectory)," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia," may provide an extraordinary and compelling reason for relief.  Second, under § 1B1.13(b)(1)(B), an extraordinary or compelling reason may exist if the defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of . . . aging," and such condition or impairment "substantially diminishes" the defendant's ability to care for himself.  Third, under § 1B1.13(b)(1)(C), an extraordinary or compelling reason

may exist if "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death."

Finally, under § 1B1.13(b)(1)(D), relief may be warranted if:

(i)     the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

(ii)    due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

(iii)   such risk cannot be adequately mitigated in a timely manner.

In my view, relief is warranted under § 1B1.13(b)(1)(D), because defendant's medical conditions place him at increased risk of suffering severe medical complications if he is afflicted with COVID-19 while incarcerated.

To be sure, as of December 12, 2023, there were no open cases of COVID-19 at U.S.P. Hazelton, where Taylor is currently housed.  *Inmate COVID-19 Data*, FEDERAL BUREAU OF PRISONS,  https://perma.cc/RDN6-WMPB (last updated December 12, 2023).  However, since the pandemic began, U.S.P. Hazelton has experienced 392 cases of COVID-19, and 3 COVID-19 related deaths.  *Id.*  And, as discussed previously, COVID-19 remains a pervasive public health crisis and a disease that can spread quickly in prison facilities.  Therefore, this implicates U.S.S.G. § 1B1.13(b)(1)(D)(i).

Taylor's health conditions also leave him at "increased risk of suffering severe medical complications" related to infection with COVID-19.  U.S.S.G. § 1B1.13(b)(1)(D)(ii).  In particular, defendant's extensive medical records indicate that he suffers from several serious health

problems.  These include, "acute ulcerative colitis with thickened des[c]ending/sigmoid colon," "severe left sided colitis," "low white blood cell count, type 2 diabetes, high blood pressure, bad liver, high cholesterol, [and] bad vision . . . ."  ECF 94 at 5.

Defendant's extensive medical records detail his health issues.  *See* ECF 94-1; 107-1.[6]  For example, the records show that Taylor has hypertension (ECF 107-1 at 11), anemia (*id.* at 16), type 2 diabetes mellitus (*id.*), chronic apical periodontitis (*id.* at 74), and he experienced a "TIA," which is an abbreviation for transient ischemic attack.[7]  *Id.* at 70; *see also id.* at 110.  In addition, defendant is "Insulin Dependent," *id.* at 36, and takes several medications.  These include low dose aspirin (daily), atorvastatin (nightly), ferrous sulfate (every other day), glucose (daily, as needed), insulin NPH (two units, twice daily), insulin reg (four times daily, as needed), and lisinopril (daily).  *Id.* at 74.  He also uses medical devices, including medical shoes, a glucose meter, and eyeglasses.  *Id.* at 115, 141.

Defendant's medical records also indicate that as of April 6, 2022, defendant had a body mass index ("BMI") of 33.  *Id.* at 30.  A person with a BMI over 30 is considered obese, and a person with a BMI over 40 is considered "severe[ly]" obese.  *Defining Adult Overweight & Obesity*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/8JTN-5GMC (last visited Dec. 13, 2023).

According to the CDC, the health conditions of hypertension, obesity, and diabetes each place a person at increased risk of severe COVID-19.  *People with Certain Medical Conditions*,

---

[6] The most recent medical records are from 2022.

[7] According to the CDC, "[a] transient ischemic attack (TIA) is sometimes called a 'mini-stroke.'"  *About Stroke*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/DR2M-XCQV (last visited December 13, 2023).  However, "[i]t is different from the major types of stroke, because blood flow to the brain is blocked for only a short time—usually no more than 5 minutes."  *Id.*

*supra*, https://perma.cc/923J-T5P8.   Moreover, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *Id*.  Therefore, I readily conclude that Taylor's medical conditions place him at "increased risk of suffering severe medical complications" related to infection with COVID-19.  U.S.S.G. § 1B1.13(b)(1)(D)(ii).  And the risk to a person in a penal setting is certainly more difficult to manage as compared to the risk for a person who is not in custody.

Nor is there reason to think that the spread of COVID-19 can be "mitigated" in the relevant sense.  The number of Americans hospitalized with COVID-19 increased by ten percent between November 19, 2023, and November 25, 2023.   *COVID Data Tracker*, *supra*, https://covid.cdc.gov/covid-data-tracker/#datatracker-home.  According to a report issued by the CDC on December 8, 2023, "COVID-19 activity has continued to increase, especially in the Midwest and Mid-Atlantic regions."  *Weekly Viral Respiratory Illness Snapshot*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/MN2U-XEWP (last updated Dec. 8, 2023).

In short, COVID-19 continues to pose a health risk, and many of Taylor's health conditions are chronic, according to the records provided to the Court.  Therefore, I am satisfied that Taylor has established an extraordinary and compelling reason for relief under U.S.S.G. § 1B1.13(b)(1)(D).

## B.

Having determined that Taylor has established an extraordinary and compelling reason for relief, I must next consider whether a sentencing reduction would be consistent with the sentencing factors enumerated in 18 U.S.C. § 3553(a).

### 1.  Taylor's Age

When outlining defendant's basis for compassionate release, Taylor notes: "I am 54 . . . ."

ECF 94 at 5.  Since the Motion was filed, Taylor has turned 55 years of age.  *BOP Inmate Locator* (Register Number "56128-037"), *supra*.  In its Opposition, the government does not address Taylor's age.

"Recent analysis from the Bureau of Justice Statistics considering the recidivism rates of released prisoners in 30 states (including [Maryland]) from 2005 to 2010 supported the Commission's conclusion, finding decreased recidivism rates as prisoners age.[ ]"  *United States v. Payton*, 754 F.3d 375, 377 (6th Cir. 2014) (emphasis added) (citing United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010* at 12 (April 2014), https://perma.cc/ZE9K-QD9U; *see also United States v. Howard*, 773 F.3d 519, 533 (4th Cir. 2014) ("[S]tudies demonstrate that the risk of recidivism is inversely related to an inmate's age.").  Indeed, those aged 40 years or older had the lowest recidivism rates.  *See Recidivism of Prisoners*, at 12.

District courts in the Fourth Circuit have considered a defendant's current age as it relates to recidivism when balancing the § 3553(a) factors in regard to a motion for compassionate release.  *See, e.g.*, *United States v. Hill*, 2023 WL 35211, at *9 (E.D. Va. Jan. 4, 2023) (age 59); *United States v. Mills*, DCN-97-815, DCN-98-786, 2022 WL 206074, at *6 (D.S.C. Jan. 24, 2022) (age 57); *United States v. Epstein*, JKB-17-453, 2020 WL 4339325, at *2 (D. Md. July 28, 2020) (age 60).  Defendant's age weighs in his favor.

## 2.  Rehabilitation

In supplemental correspondence, Taylor maintains that he has been rehabilitated over the past ten years of his incarceration.  *See* ECF 98.  He points out that he has "taken numerous AA, NA, SEIEHIEP, programs" to gain skills and prepare himself for lawful employment.  *Id.* at 1.  Moreover, he has "earned a trade in GRAPHIC ARTS DESIGN."  *Id.*  And, he claims that he has

"a job awaiting [his] release," and "a stable home to go to." *Id.*; *see also* ECF 94 at 7.  Moreover, defendant notes that he has five grown children and nine grandchildren, ECF 98 at 2, and asserts that he "want[s] to be a better man in society for them as well as for [him]self, and [his] community." *Id.*; *see* ECF 94 at 7.

With his Motion (ECF 94), Taylor attached a "Proposed Release Plan," which includes the address and name of the person with whom he intends to reside. *Id.* at 7.  He also states that he has secured employment at Fed Ex in White Marsh, Maryland. *Id.*  And, he includes an address for "additional housing or employment resources available to [him]." *Id.*

Further, Taylor states that he will require ongoing medical care if released. *Id.* at 8.  And, he states that he will have health insurance from Paramount Advantage. *Id.*  He explains that the people with whom he will reside know of his health conditions and that his four daughters and one friend can assist him with his medical needs. *Id.*  He also states that his family will transport him to and from his medical appointments. *Id.*

In response, the government points to the seriousness of the underlying offenses.  It underscores that "Mr. Taylor admitted to possessing a loaded handgun on the streets of Baltimore City." ECF 107 at 4.  And, it argues that before and after defendant's conviction, "Baltimore City has suffered from extraordinary levels of violent crime and the City remains one of the most violent in the country." *Id.*  Thus, the government contends that the facts in defendant's case "cannot obscure the seriousness of the offense and the need to deter others from committing similar crimes." *Id.*

Along the same lines, the government argues that defendant "has an extensive criminal record that stretches back nearly 35 years." *Id.*  The government asserts, *id.*: "At the time of his arrest here, Mr. Taylor was still on probation for his conviction for first degree assault."  Thus, the

government contends that defendant was not deterred from "continuing criminal conduct," and that there is a resulting "need to protect the community from Mr. Taylor." *Id.* However, the government has not provided evidence that Taylor committed infractions while incarcerated.

Nevertheless, the Court cannot overlook Taylor's prior record. I agree with the government that Taylor's crime was a serious one: Taylor possessed a loaded handgun when he was prohibited from possessing such a weapon. But, it is also noteworthy that defendant has already served about eleven and a half years of imprisonment—a period far longer than any prior sentence he has served.

For example, the drug offense referenced in ECF 46, ¶ 45 occurred in February 1996. Taylor was sentenced to seven years of imprisonment in February 1997. And, he was paroled in January 2002. Thus, at most, defendant served five or six years of imprisonment for that offense.[8]

With respect to defendant's first-degree assault conviction, *id.* ¶¶ 51-54, he received a lengthy sentence of 25 years of incarceration. *Id.* ¶ 51. However, the court suspended 18 years of that sentence. The offense occurred on August 13, 2004; the defendant was sentenced in August 2005; and he was released in November 2008. *Id.*[9] Therefore, at most, defendant served less than five years of imprisonment.

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'" *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020). Accordingly, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact. The statutory

---

[8] I cannot determine whether defendant was in pretrial custody.

[9] Defendant violated his probation, ECF 46, ¶ 51, but the violation was pending when the PSR was prepared.

text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in this Circuit and elsewhere have granted sentence reductions without immediate release.  *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37–38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F. Supp. 3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); *see also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . . .").

Defendant has presented compelling factors in favor of his release.  Nevertheless, the nature of the offense, coupled with defendant's prior criminal history, suggest that immediate release is not warranted.

## V.  Conclusion

For the foregoing reasons, I shall grant the Motion in part and reduce defendant's sentence from 180 months to 165 months of imprisonment.  All terms and conditions of the supervised release imposed in the Judgment of February 27, 2014 (ECF 58), shall remain in effect.

A revised Judgment shall issue.

An Order follows, consistent with this Memorandum Opinion.

Date:   December 14, 2023                                    _____/s/_____
                                                             Ellen Lipton Hollander
                                                             United States District Judge